**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RABIJA ALIC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:13cv0638 TCM** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the application of Rabija Alic for disability insurance benefits ("DIB") under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

## Procedural History

Ms. Alic (Plaintiff) applied for DIB in May 2010, alleging she was disabled since March 27 of that year by low back pain radiating to the right leg, chest pain and a pacemaker, liver damage, and an inability to stand, walk, or sit for long without pain. (R.[1] at 127.) Her application was denied on initial review and following a November 2011 hearing before Administrative Law Judge ("ALJ") James K. Steitz. (Id. at 6-17, 22-33, 40-41, 44-48.) The

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, testified at the administrative hearing.[2]

Plaintiff, then forty-nine years old, testified that she was born in Bosnia and came to the United States in 2001.  (Id. at 25.)  She lives in a second-floor apartment with her son, daughter-in-law, and granddaughter.  (Id.)  Because of her back, she has difficulty climbing the stairs.  (Id. at 26.)  She had eight years of school, all in Bosnia.  (Id.)  She can read and write in Bosnian, but not in English.  (Id. at 26-27.)  Her daughter-in-law does the household chores, including the cooking and laundry.  (Id. at 32.)

Plaintiff testified that she can "probably" lift a gallon of milk.  (Id. at 27.)  She cannot stand for longer than twenty minutes before having to sit down and cannot sit for longer than fifteen minutes before having to change positions.  (Id.)  She cannot walk for longer than fifteen minutes before having to stop.  (Id.)  These needs to change position are because of her back pain and her pacemaker, which was installed in 2009.  (Id.)  She cannot dress herself without help, particularly when putting on pants and shoes.  (Id.)

The pain in her back radiates down her right leg "[m]any times a day."  (Id. at 28.)  Her pacemaker "engage[s]" sometimes three times a day and sometimes more frequently.  (Id. at 29.)  When it does, she has to be silent and wait.  (Id.)

---

[2]A Bosnian translator was also present and translated for Plaintiff.

Because of problems with her left shoulder, Plaintiff cannot lift her arm up. (Id.)
Because of problems with her right knee, she uses a cane all the time. (Id.)

Also, Plaintiff suffers from depression. (Id. at 30.) She lost thirty family members
during the war, including her brother and sister. (Id.) Dreams about the war keep her from
sleeping all night. (Id.) She cries two or three times a day. (Id.) When she cries, she prefers
to be by herself. (Id. at 31.) Her only hobby is watching Bosnian channels on television.
(Id.) She has auditory hallucinations of hearing people calling for her to help them. (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ includes documents generated pursuant to
Plaintiff's application, records from health care providers, and assessments of her mental and
physical functional capacities.

On a Disability Report, Plaintiff stated that she stopped working because of her
condition on March 27, 2010. (Id. at 127.) She did not make any changes in her work
activity. (Id.)

Asked on a Function Report, to describe what she does during the day, Plaintiff
explained that she stays inside most of the day, lying or sitting on her couch. (Id. at 150.)
She tries to go with her son when he goes grocery shopping and tries to walk if it is not too
hot. (Id.) Pain prevents her from sleeping well. (Id. at 151.) She does not have any problem
with personal grooming tasks. (Id.) Her son always reminds her about doctors appointments
or to take her medication. (Id. at 152.) Her impairments adversely affect her abilities to lift,
squat, bend, stand, reach, walk, sit, kneel, remember, concentrate, understand, climb stairs,

complete tasks, follow instructions, and use her hands. (Id. at 155.) She can walk for fifty meters before having to stop and rest for ten minutes. (Id.) She does not handle stress or changes in routine well. (Id. at 156.) She uses a walker. (Id.)

On a Work History Report, Plaintiff described her hotel housekeeping job as requiring that she frequently lift twenty-five pounds, occasionally lift fifty pounds, kneel or crouch for five hours, and stoop, e.g. bend down and forward at the waist, for five hours. (Id. at 143.)

After the initial denial of her application, Plaintiff completed a Disability Report – Appeal form, explaining that, since completing the original form, she had become depressed and was seeing a psychiatrist. (Id. at 163.) Her other impairments were worse. (Id.)

On an earnings report for the years from 2001 to 2009, inclusive, her lowest annual earnings were $2,913, in 2001; her highest were $25,737, in 2008. (Id. at 111.) Her earnings increased every year until 2009, when they fell to $23,508. (Id.) Plaintiff listed two jobs on a Work History Report, the longest of which was as a housekeeper for the Frontenac Hilton. (Id. at 118, 142.) This job required that she frequently lift twenty-five pounds and occasionally lift fifty pounds. (Id. at 143.) She had to walk for two hours, climb for one, and stoop, kneel, or crouch for five hours. (Id.)

As of August 2010, a list of her medications named sumatriptan (for headaches), oxycodone (for pain), metoprolol (for high blood pressure), hydrocholorothiazide (HCTZ, also for high blood pressure), ranitidine (for gastroesophageal reflux disease), and Cymbalta (for depression). (Id. at 169.) All were prescribed by Dr. Keric. (Id.)

The medical records begin in October 2006 when, on the referral of Edina Karhodzic, M.D., Plaintiff was seen by an internist, Bruce R. Bacon, M.D., who scheduled her for an endoscopy and lab work.[3]  (Id. at 412-14, 444-48.)

In January 2007, Dr. Bacon noted that Plaintiff had had an upper endoscopy which revealed gastroesophageal reflux disease ("GERD"), for which she was taking omeprazole (a generic form of Prilosec).  (Id. at 408-10.)  Lab work had shown her to be iron deficient and to have hepatitis B.  (Id. at 408.)  A computed tomography ("CT") scan of her abdomen was, with the exception of a left hepatic lobe cyst, unremarkable.  (Id. at 449.)

In May, Dr. Bacon noted that a colonoscopy was normal; Plaintiff had no new complaints.  (Id. at 402-04.)  Dr. Bacon started her on iron supplements.  (Id. at 402.)

In September, Plaintiff told Dr. Bacon that she was feeling better since she had started taking the iron supplements.  (Id. at 399-401, 429.)  She had had some recent chest pain, but stress test performed several years earlier when she was seeing a cardiologist had been negative.  (Id. at 399, 401.)  Tests revealed she was still iron deficient; she was to continue taking the iron supplements for another three to four months.  (Id. at 399.)

In March 2008, Plaintiff reported to Dr. Bacon that she was having symptoms of dyspepsia (painful or difficult digestion) for the past month.  (Id. at 396, 422-28)  Her prescription for Prilosec, which had been helpful, had run out.  (Id. at 396, 397.)  She had stopped taking her iron supplements.  (Id. at 396.)  She was to continue taking the supplements.  (Id.)  Her prescription for Prilosec was renewed.  (Id.) ,

_____

[3]Plaintiff was always accompanied at medical visits by a translator or a family member who translated for her.

Plaintiff consulted Emir Keric, M.D., as a new patient in April. (Id. at 368-69, 384-85.) She complained of swelling in her legs for more than one year, GERD, and low back and stomach pain. (Id. at 368.) Also, she had a history of a gastric ulcer and hepatitis B. (Id. at 369.) She was prescribed medications for the GERD and the pain. (Id.)

When Plaintiff next saw Dr. Keric, in June, she reported that her stomach pain was less, but she had pain in her left leg. (Id. at 370-71.) She was prescribed Celebrex and was to return in three months for lab work. (Id. at 371.)

Plaintiff saw Dr. Bacon again on September 8. (Id. at 393-95, 419-21.) She complained of heartburn but was not taking any proton pump inhibitors ("PPIs") to block the production of gastric acid. (Id. at 394.) Otherwise, she felt well. (Id.) Dr. Bacon predicted that tests would show that she had "a very low [iron] level." (Id. at 393.) Plaintiff informed him she was going to resume taking iron supplements. (Id.) And, she was given a prescription for Protonix, a PPI. (Id.)

In September, Plaintiff complained to Dr. Keric of jaw pain, but reported that her leg pain was better. (Id. at 372-73.) Her pain was "much better" when she saw him the next month. (Id. at 374-75.)

Plaintiff saw Dr. Keric again in December, reporting that the pain was worse in her left foot. (Id. at 376-77, 380-81.) X-rays of her lumbar spine revealed levoscoliosis, multilevel degenerative disc disease, spina bifida occulta from T12 through L2, and a possible unilateral left L5 pars defect. (Id. at 380-81.) She was prescribed Vicodin. (Id. at 377.)

On January 2, 2009, Plaintiff consulted Dr. Keric about pain her low back that radiated from her left to her right. (Id. at 378-79.) He diagnosed her with degenerative joint disease of the spine. (Id. at 379.)

Ten days later, she saw Naseem A. Shekhani, M.D., for complaints of low back pain of six to seven months' duration; the pain had increased during the past few weeks. (Id. at 332-33, 388.) The pain was aggravated by activity and alleviated by rest. (Id. at 333.) It was a ten on a ten-point scale.[4] (Id.) She sometimes had difficulty walking. (Id.) She also had occasional numbness in her right lower extremity, which was worse with activity, and left heel and shoulder pain. (Id.) On examination, the range of motion in her neck was normal, but was decreased in her spine. (Id. at 332.) Straight leg raises were positive on the left and negative on the right.[5] (Id.) Her left heel was tender to the touch. (Id.) She had an antalgic gait. (Id.) Dr. Shekhani's diagnosis was sciatica, left rotator cuff syndrome, left plantar fasciitis, and antalgic gait. (Id. at 332.) He prescribed home exercises and recommended a magnetic resonance imaging ("MRI") of her spine if approved by insurance. (Id.) He also discussed with her a possible injection in her plantar fascia and left shoulder, if necessary. (Id.) The MRI revealed facet degenerative arthropathy at L5-S1 and mild broad based disc protrusion with facet hypertrophy at L4-L5. (Id. at 388.)

---

[4]References in the medical records to a scale are always to a ten-point scale on which ten is the worst.

[5]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

Plaintiff saw Dr. Shekhani again on January 23. (Id. at 331.) Her left leg hurt more than her right. (Id.) On examination, she was as before. (Id.) She was given trigger point injections at L4 and prescribed Darvocet (a pain medication). (Id.)

Two weeks later, on February 6, Plaintiff reported to Dr. Shekhani that the injection had helped "a little." (Id. at 389.) Still, the pain increased with activity and decreased with rest. (Id.) Her prescription for Darvocet was renewed. (Id.)

Plaintiff returned to Dr. Bacon on March 9. (Id. at 174-75, 415-18.) She had stopped taking Protonix and iron supplements. (Id. at 174.) She was having epigastric pain and GERD symptoms that day. (Id.) Her prescription for Protonix was refilled; she was to return in four to six weeks. (Id. at 175.) Dr. Bacon wrote Dr. Keric that the return of Plaintiff's GERD symptoms was due to her stopping the Protonix. (Id. at 173.) Laboratory testing showed that her liver function was normal. (Id.)

On March 10, Plaintiff went to the emergency room at St. Anthony's Medical Center (St. Anthony's) with complaints of right quadrant pain with nausea and vomiting. (Id. at 205-23.) Her pain was a ten. (Id. at 207.) A CT scan of her abdomen and pelvis revealed a small hypodensity within the liver and small bowel loops suggestive of a mild partial obstruction and likely colonic ileus. (Id. at 219-21.) Her appendix was normal. (Id. at 221.) Chest x-rays revealed a normal heart size and no pleural effusions. (Id. at 222.) It was noted that she gave poor inspiratory effort. (Id.) An electrocardiogram ("ECG") was abnormal. (Id. at 223.) Plaintiff was have a contrast CT, but was unable to keep the contrast solution down.

(Id. at 210, 212.)  She refused the alternative solution and was discharged with prescriptions.  (Id. at 212.)

Plaintiff saw Dr. Keric on March 23 for a follow-up.  (Id. at 336-37.)  On a checklist form, Dr. Keric marked that all her systems, including her back, were within normal limits.  (Id.)  She was to continue on her current medications, including the Protonix and iron supplements.  (Id. at 337.)

Plaintiff saw Dr. Bacon in September for a follow-up of her hepatitis B, GERD, and iron deficiency.  (Id. at 171-72, 391.)  He noted that Plaintiff had stopped taking Protonix after one month and had never taken the iron supplements.  (Id. at 171.)  She was having "some" heartburn.  (Id.)  Her hepatitis was stable.  (Id.)  Her prescriptions for Protonix and iron pills were renewed.  (Id. at 172.)  She was to return in six months.  (Id.)

On October 19, Plaintiff was admitted to St. Anthony's from the emergency room after going there with a syncopal episode and epigastric pain.  (Id. at 180-81, 224-64, 551-807.)  A CT scan and ultrasound of her abdomen were unremarkable except for indicating an earlier cholecystectomy.  (Id. at 226, 229, 247-48, 253.)  A chest x-ray was negative.  (Id. at 252.)  An esophago-gastroduodenostomy ("EGD") revealed GERD.  (Id. at 226, 231-38.)  A stress test was negative for ischemia.  (Id. at 256.)  After telemetry revealed episodes of a third degree aortic valve block, Plaintiff had a pacemaker placed.  (Id. at 226.)  She was discharged in stable condition four days after admission.  (Id. at 226, 608, 788.)  She was to follow a low fat diet and see Dr. Keric in one week.  (Id. at 226.)  She was to do no heavy

lifting for the next four to six weeks and was to avoid raising her left arm over shoulder height for the same length of time. (Id. at 806.)

On November 12, Plaintiff had the follow-up appointment with Dr. Keric. (Id. at 340-41.) He noted her weight to be 206 pounds and her height to be 5 feet 2.5 inches. (Id. at 340.) Her systems, including her cardiovascular and back, were within normal limits. (Id. at 340-41.) She was prescribed Tramadol and told to follow up with Dr. Bacon. (Id. at 341.)

A December cardiac catheterization revealed normal coronary arteries with right dominant system and normal left ventricular function. (Id. at 182-83, 382.) A few days later, Plaintiff wore a Holter monitor for twenty-four hours to record her heart's rhythms. (Id. at 179.) The report was benign. (Id.)

Later that month, she went to St. Anthony's emergency room after she begun to have chest pain when at work. (Id. at 265-85, 451-76.) The pain had resolved prior to her going to the emergency room. (Id. at 267.) On examination, her heart rate and rhythm were within normal limits. (Id. at 269.) A CT angiography of her chest revealed subsegmental lingular atelectasis, the cholecystectomy, and the pacemaker. (Id. at 281.) There was no evidence of pulmonary embolism. (Id.) A chest x-ray was normal. (Id. at 283.) An ultrasound of her gallbladder and biliary tract showed the cholecystectomy and a fatty or fibrotic liver. (Id. at 284.) An ECG showed no significant change from one conducted after the pacemaker was placed. (Id. at 285.) Plaintiff was discharged with instructions to follow up with Tammam Al-Joundi, M.D. (Id. at 276.)

Consequently, Plaintiff saw Dr. Al-Joundi on December 30, reporting having dyspnea on exertion, but no transient ischemic attacks or stroke-like symptoms. (Id. at 177-78.) She was taking Prilosec and Percocet. (Id.) On examination, she was positive for dyspnea and chest pain. (Id. at 178.) She weighed 220 pounds and was 5 feet 5 inches tall. (Id.) Her examination was otherwise negative, including for depression and hallucinations. (Id.) She was continued on her current therapy and was to return in six months. (Id.)

Plaintiff reported to Dr. Keric in January 2010 that the pain was worse in her back and was radiating down her right leg. (Id. at 338-39.) On the checklist format, he noted both that her back was within normal limits and that she was tender in her low back. (Id. at 339.) She was prescribed Prilosec for her GERD and Percocet for her low back pain and was told to lose weight. (Id.)

On March 27, Plaintiff was seen at the St. Anthony's emergency room after developing back pain that radiated down her right leg. (Id. at 286-301, 478-500.) At the time, she had been lifting a mattress at her job. (Id. at 288, 291, 296.) The pain was aggravated by movement. (Id. at 291.) A CT scan of her abdomen and pelvis was unremarkable. (Id. at 299.) A lumbar spine x-ray showed degenerative changes at L1-L2. (Id. at 301.) The pain improved on medication. (Id. at 295, 297.) Plaintiff was discharged and was to follow-up with Dr. Keric. (Id. at 295, 297.)

Three days later, Plaintiff went to the Concentra Medical Centers, reporting that she had injured her back and right leg three days earlier when she bent to lift a mattress in order to make the bed. (Id. at 185, 190-97.) When seen by Marva Warmington, A.N.P., Plaintiff

appeared to be in severe distress.  (Id. at 190.)  On examination, she was tender on palpation of her bilateral medial paraspinal muscles, but not over her spine.  (Id. at 191.)  Her right hip and S1 area were also tender.  (Id.)  She could not stand erect, had a slow and antalgic gait, and could move only a few degrees in any direction.  (Id.)  Straight leg raises were positive on the right at 20 degrees and on the left at 45 degrees.  (Id.)  The diagnosis was lumber radiculopathy and lumbar strain.  (Id.)  She was to continue the medications prescribed for her at St. Anthony's, apply ice to the injured area for two days and then switch to moist heat, do home exercises as instructed, participate in physical therapy three times a week for two weeks, and remain off work.  (Id.)

The same day, Plaintiff had her initial physical therapy visit.  (Id. at 194-97.)

On March 31, Plaintiff informed Ms. Washington that the medications did not help.  (Id. at 188-89.)  On examination, she was alert and oriented and in moderate distress.  (Id. at 188.)  She had a "[v]ery limited range of motion" in her lumbar spine and was unable to stand erect.  (Id.)  She got on and off the examination table with difficulty.  (Id.)  Her gait was slightly improved, but was still slow and antalgic.  (Id.)  Waddell signs[6] were positive for distraction.  (Id.)  Straight leg raises were positive on the right at 30 degrees and on the left at 75 degrees.  (Id.)  Plaintiff was diagnosed with lumbar strain and was to continue on her current medications and with physical therapy, do her home exercises, and apply moist heat to the injured area.  (Id. at 189.)  She was not to lift over ten pounds, push or pull over

---

[6]"Waddell signs are a group of 8 physical findings, . . . the presence of which has been alleged at times to indicate the presence of secondary gain and malingering."  Fishbain, DA, et al., Is there a relationship between nonrganic physical findings (Waddell signs) and secondary gain/malingering?, http://www.ncbi.nlm.nih.gov/pubmed/15502683 (last visited Aug. 8, 2014).

twenty pounds of force, and bend more than two times an hour.  (Id.)  She was to frequently change her position.  (Id.)

At her physical therapy session the same day, Plaintiff reported that her back was not better.  (Id. at 202-03.)  Her pain was a nine on a ten-point scale.  (Id. at 202.)  It was noted that she tolerated the therapy at that session and at the previous session "fairly well."  (Id.)

At the next, April 6 physical therapy session, Plaintiff reported that she was worse since the last therapy visit.  (Id. at 198-201.)  Her pain was aggravated by standing, sitting, and walking.  (Id. at 198.)  She was not doing her home exercises.  (Id.)  She tolerated the session well, although she demonstrated "poor effort."  (Id. at 199, 200.)

The same day, Plaintiff reported to Ms. Warmington that the physical therapy had not helped.  (Id. at 186-87.)  She had not been performing her home exercises because the pain was too great.  (Id. at 186.)  Ms. Warmington noted that the physical therapist had reported poor compliance and effort by Plaintiff at the therapy sessions.  (Id.)  On examination, she had a "[s]everely diminished [range of motion] in all directions because [she] refuse[d] to attempt."  (Id.)  Her gait was slow but normal.  (Id.)  She had difficulty getting up on her toes or heels.  (Id.)  Ms. Warmington discussed with Plaintiff, through her translator and daughter-in-law, that her subjective complaints were inconsistent with the objective findings.  (Id.)  She opined that Plaintiff's unimproved, persistent pain was more likely due to degenerative changes in her lumbar spine than to a muscular strain that would improve with physical therapy.  (Id.)  Plaintiff was again instructed to continue with her previous

medications, apply moist heat to the injured area, and do her home exercises.  (Id. at 187.) She was released from care at Concentra.  (Id.)

Two days later, Plaintiff returned to Dr. Keric for her back pain and atypical chest pain.  (Id. at 342-44, 386-87.)  Her weight was 217 pounds; her height was unchanged.  (Id. at 342.) On examination, she was alert and oriented, anxious, sad, and "mildly ill appearing." (Id.)  She had significant muscle spasms in her lower back, paraspinal tenderness on palpation, positive straight leg raises on both sides, an unremarkable gait, and normal bilateral lower extremities.  (Id. at 342-43.)  He prescribed her alprazolam for anxiety and told her to see Dr. Shekhani to continue physical therapy or have a paravertebral blockade. (Id. at 343.)

On April 14, Plaintiff saw Sandra Tate, M.D., reporting that she had developed back pain after lifting a lot of mattresses at work on March 27.  (Id. at 527-29, 538-39, 545.)  She described the pain as stabbing, aching, and ranging from one to eight.  (Id. at 528.)  The pain was aggravated by bending, sitting, coughing, sneezing, standing, twisting, lifting, and walking.  (Id.)  On examination, Plaintiff was not in acute distress and had an appropriate mood and affect.  (Id.)  She moved "very slowly and deliberately."  (Id.)  Her range of motion in her lumbosacral spine was 50 percent of normal.  (Id.)  Straight leg raises were negative to 90 degrees in both the sitting and lying positions.  (Id.)  She had diffuse paravertebral tenderness with muscle tightness. (Id.) Dr. Tate recommended she undergo physical therapy, temporarily limited her to lifting no more than ten pounds, planned on obtaining Dr.

Shekhani's medical records, continued Plaintiff on Vicodin, and anticipated seeing her again in one week. (Id. at 529.)

After having last seen Dr. Shekhani in January 2009, Plaintiff returned to him on April 15 for her complaints of leg pain, worse on the left than the right, and difficulty walking. (Id. at 330.) After examining Plaintiff, Dr. Shekhani repeated his earlier diagnosis, home exercise recommendation, and prescription for Darvocet. (Id.) Plaintiff was to return in two weeks. (Id.)

The same day, on the referral of Dr. Tate, Plaintiff was seen by a physical therapist at St. Louis Rehabilitation Institute. (Id. at 355, 503, 507.) She reported that she was in constant pain that was a six or seven. (Id. at 355.) The pain was "stabbing and aching" and was aggravated by bending forward, walking, standing, and lying supine. (Id.) The therapist opined that Plaintiff had "good rehab potential." (Id.) It was also noted that it was difficult for Plaintiff to stand erect without some support due to her pain. (Id.) Plaintiff was to have physical therapy to increase her core and pelvic flexibility and strength. (Id.)

On April 20, after three visits, Plaintiff reported to the physical therapist that her low back pain was the same. (Id. at 356, 504-05, 508.) When sitting, Plaintiff leaned to one side. (Id. at 356.) She was guarded with any movement. (Id.)

The next day, Plaintiff saw Dr. Tate, reporting that her back pain was the same and that physical therapy had given her only temporary relief. (Id. at 530-31, 540, 546.) She had been taking two Vicodin a day, but had run out of the medication. (Id. at 530.) The back pain radiated into her right leg down to the top of her foot. (Id.) Dr. Tate had not yet

received Dr. Shekhani's records.  (Id.)  On examination, Plaintiff was the same as the week before with the exception of her gait.  (Id. at 530-31.)  She walked "extremely slow" and flexed forward at the waist.  (Id. at 531.)  Dr. Tate gave her a refill of the Vicodin prescription and released her to return to work with restrictions of lifting no more than twenty pounds and no bending at the waist.  (Id.)

Plaintiff saw Dr. Keric on April 16 for a follow-up.  (Id. at 345-46.)  She was started on an iron supplement for her anemia and continued on her previous medications.  (Id.)

When seeing Dr. Tate two days later, Plaintiff complained of increasing pain in her low back that radiated to the back of her head.  (Id. at 532-33, 541.)  The pain had become so great that she was now using a cane.  (Id. at 532.)  Any activity increased her pain; nothing decreased it.  (Id.)  She was able to get up and walk around the examination room without the cane.  (Id.)  Her mood and affect were anxious.  (Id.)  Her range of motion and straight leg raises were as before.  (Id.)  Her gait was slow.  (Id.)  Dr. Tate had yet to receive any of Dr. Shekhani's treatment notes.  (Id.)  She explained to Plaintiff that a determination of what caused her back pain could not be made without those notes and requested that Plaintiff pick them up from Dr. Shekhani's office.  (Id.)

The next day, Plaintiff was seen at St. Anthony's emergency room for complaints of weakness, dizziness, numbness in her right leg, and back pain radiating down to her right leg.  (Id. at 302-25.)  X-rays of her lumbar spine showed the degenerative changes at L1-L2 earlier revealed, but no other abnormalities.  (Id. at 317-18.)  X-rays of her cervical spine showed a congenital fusion of the body of C2 and C3.  (Id. at 321-22.)  X-rays of her right hip and

of her chest were normal.  (Id. at 319, 323.)  An x-ray of her pelvis showed a focal area of sclerosis in the interior left pubic ramus.  (Id. at 320.)  Plaintiff was discharged after being given morphine and Zofran intravenously.  (Id. at 309.)

Plaintiff then saw Dr. Shekhani.  (Id. at 329.)  Straight leg raises were positive on the right and not on the left.  (Id.)  Her strength was 5/5.  (Id.)  She had an antalgic gait.  (Id.)  The range of motion in her back was restricted.  (Id.)  He again discussed with Plaintiff a home exercise program.  (Id.)  Also, he recommended that she have an epidural injection; one was scheduled for the next week.  (Id.)  He informed Plaintiff she needed to work with Dr. Tate for worker's compensation purposes.  (Id.)

Dr. Tate had received Dr. Shekhani's records by the time she next saw Plaintiff, on May 5.  (Id. at 534-35, 542, 544.)  She noted that Plaintiff continued to use a cane to walk.  (Id. at 534.)  On examination, Plaintiff's range of motion in her lumbosacral spine was self-limited to 30 percent of normal.  (Id.)  Straight leg raises were negative to 90 degrees in a sitting position; however, she complained of back pain in a lying position.  (Id.)  Her gait was "very slow, but she [was] able to ambulate for a few steps without the cane.  She would not walk on toes or heels."  (Id. at 535.)  Because of a fall at work the previous Friday, Plaintiff was not to return to work until a CT scan had been performed.  (Id.)  The CT scan revealed mild lumbar spondylosis, most marked at L4-5 with disc bulging; facet disease; and ligamentum flavum hypertrophy resulting in moderate central canal and bilateral lateral recess stenosis.  (Id. at 544.)  There was no significant disc herniation, fracture, or subluxation.  (Id.)

On May 6, Dr. Shekhani gave Plaintiff an epidural injection in her lumbar spine.  (Id. at 328.)

Plaintiff was "still experiencing back pain and right greater than left leg pain that [was] getting progressively worse" when she next saw Dr. Tate, on May 11.  (Id. at 536-37, 543, 547.)  Her mood and affect were appropriate.  (Id. at 536.)  Her gait was within normal limits and without specific or coordination deficits.  (Id.)  Her range of motion of her lumbosacral spine was self-limited as before.  (Id.)  Dr. Tate opined that Plaintiff's March 2010 work injury was not the cause of her current symptoms; rather, they were caused by pre-existing degenerative changes.  (Id. at 537.)  She also opined that there was symptom magnification.  (Id.)  She recommended only a restriction of lifting no more than twenty pounds and no bending at the waist.  (Id.)

Plaintiff reported to Dr. Shekhani on May 20 that she had had only initial relief from the injection.  (Id. at 327.)  Her back and left shoulder pain were constant and between six and nine on a ten-point scale.  (Id.)  His diagnoses and treatment plan was unchanged.  (Id.)  He was to refer Plaintiff to a spine surgeon for a consultation.  (Id.)

On June 3, Plaintiff saw Dr. Keric for pain in her back and right flank and swelling in her left leg.  (Id. at 347-48.)  Her current medications included Lortab (for pain relief), alprazolam (an anti-anxiety medication), omeprazole, and an iron supplement.  (Id. at 347.)  She was also prescribed Darvocet and was told to diet and exercise.  (Id.)  On examination, she had no swelling in her extremities.  (Id.)  Her weight was then 218 pounds.  (Id.)

The next day, Plaintiff underwent a psychosocial evaluation at Psych Care Consultants.[7] (Id. at 808-11.) Plaintiff reported that she was separated from her husband, living with her son and his family, and not working. (Id. at 808.) She was having bad dreams and difficulty sleeping. (Id.) She was nervous. (Id.) She was diagnosed with major depressive disorder with psychotic features. (Id. at 811.) Her Global Assessment of Functioning ("GAF") was 41.[8] (Id.) She was given supportive therapy and a prescription for Cymbalta. (Id.)

On July 29, Plaintiff told the clinician that she was worried about her inability to hold a job. (Id. at 812, 815.) Her husband was living with his mother. (Id.) She was depressed. (Id.) Her Cymbalta dosage was increased. (Id.) She was to return in four weeks. (Id.)

She did, reporting that she was eating cream and potatoes and gaining weight. (Id. at 813, 814.) She was told to eat a healthy diet. (Id.) She also reported she was having nightmares about the war in Bosnia and had lost several family members in that war. (Id.) Her diagnosis and GAF were as before. (Id.) She was to return in two weeks. (Id.)

---

[7]The clinician's illegible signature is the only indication of who treated Plaintiff. The clinician's professional qualifications are not listed. In her supporting brief, Plaintiff identifies the provider as Dr. Farida Farzana. (Pl.'s Br. at 9.) A Farida Fazana, M.D., is listed in a directory of health care providers as being a psychiatrist with Psych Care Consultants. See RateMDs, http://www.ratemds.com/doctor-ratings/2691138/Dr-FARIDA-FARZANA-St.+Louis-MO.html (last visited Aug. 7, 2014).

[8]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'"" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

She did not; instead, she returned in three months, on November 18. (Id. at 816.) She reported that she was a little better, but could not sit still and could not sleep. (Id. at 816.) Her diagnosis, GAF, and prescription were unchanged. (Id.) She was to return in eight weeks. (Id.)

She did, in January 2011. (Id. at 817-18.) She was described as being very sad, withdrawn, and preoccupied. (Id. at 817.) She kept crying. (Id. at 818.) She was worried about her health and could not concentrate or focus well. (Id.)

In addition to the foregoing medical records, various assessments of Plaintiff's physical and mental functional capacities were before the ALJ.

In July 2010, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Kyle DeVore, Ph.D. (Id. at 357-67.) Plaintiff was assessed as having a non-severe anxiety-related disorder. (Id. at 357.) This disorder resulted in mild restrictions in her daily living activities, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (Id. at 365.) There were no repeated episodes of decompensation of extended duration. (Id.)

The next month, a Physical Residual Functional Capacity Assessment of Plaintiff was completed by Maria Wilson, a single decision maker.[9] (Id. at 34-39.) The primary diagnoses were 11/12 osteophyte and degenerative changes; the secondary diagnoses were left rotator cuff syndrome and left plantar fasciitis; other alleged impairments included having a

---

[9]See 20 C.F.R. §§ 404.906, 416.1406 (defining role of single decision-maker under proposed modifications to disability determination procedures). See also **Shackleford v. Astrue**, 2012 WL 918864, *3 n.3 (E.D. Mo. Mar. 19, 2012) ("Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician.") (citation omitted).

pacemaker and GERD.  (Id. at 34.)  These impairments resulted in exertional limitations of

Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry less

than ten pounds; and sit, stand, or walk for approximately six hours in an eight-hour day.  (Id.

at 35.)  Her abilities to push and pull were otherwise unlimited.  (Id.)  She had postural

limitations of never climbing ladders, ropes, and scaffolds and only occasionally stooping,

kneeling, crouching, crawling, and climbing ramps and stairs.  (Id. at 36.)  She was limited

in her ability to reach overhead due to her rotator cuff syndrome.  (Id.)  She had no visual or

communicative limitations.  (Id. at 36-37.)  She had environmental limitations of needing to

avoid concentrated exposure to vibrations and extreme cold or heat.  (Id. at 37.)  She should

avoid even moderate exposure to hazards, e.g., machinery or heights.  (Id.)

     In February 2011, pursuant to her worker's compensation claim, Plaintiff had an

independent medical examination ("IME") by David T. Volarich, D.O.  (Id. at 509-22.)

Plaintiff reported that she had first injured her back on December 21, 2008, when lifting a

king-size mattress at work.  (Id. at 511.)  She disputed Dr. Keric's reference in his treatment

notes of the next day that her back pain had been present for six weeks.  (Id.)  On March 24,

2010, she slipped and fell, jarring her back.  (Id.)  She did not receive any treatment for this

injury.  (Id.)  Three days later, she experienced severe low back pain when again lifting a

mattress at work.  (Id.)  After further describing Plaintiff's medical history and records, Dr.

Volarich summarized her present complaints.  (Id. at 513-14.)  Those complaints included

having to use a cane to walk, being unable to walk for longer than fifteen minutes before

needing to sit down, having to use the handrail when climbing stairs, not being able to lift

even a gallon of milk without difficulty, and having difficulty moving after doing any bending, twisting, pushing, or pulling. (Id. at 513.) She stayed around the house during the day. (Id.) She could care for herself, but moved slowly. (Id.) She did not do any household chores and was no longer able to cook. (Id.) She did not sleep well. (Id.) She had not had any back problems before the December 2008 injury. (Id.) Before that injury, she would miss approximately ten days of work a year due to nausea and right flank pain. (Id. at 514.) Even after her pacemaker was placed, she had some chest pain and shortness of breath. (Id.) She was, however, able to continue to work full duty without any physician-imposed restrictions. (Id.)

On examination, she was 5 feet 3 inches tall and weighed 226 pounds. (Id. at 515.) Her body mass index ("BMI") was 40. (Id.) Her heart had a regular rate and rhythm. (Id.) Her lung sounds were normal. (Id.) She had a flat affect and appeared to be depressed. (Id. at 516.) "She dwel[t] considerably on her pain syndrome." (Id.) In her upper extremities, she had symmetrical muscle bulk, tone, and strength. (Id.) Complaints of back pain radiating to both legs prevented an assessment of the strength of her lower extremities. (Id.) She had diminished pinprick sensation in both lower extremities. (Id.) She had a slow, careful gait. (Id.) When entering the examination room, she used a cane. (Id.) She could walk back and forth across the room without the cane, but reported pain with every step. (Id.) She could not perform any other gait maneuvers. (Id.) She had a 53 percent loss of range of motion on flexion of her lumbar spine, a 60 percent loss on extension, a 44 percent loss on right lateral flexion, and a 52 percent loss on left lateral flexion. (Id.) She had pain

with all movements.  (Id. at 516-17.)  Straight leg raises were positive at ten degrees on the right and were unattempted on the left due to pain.  (Id. at 517.)  Dr. Volarich rendered a diagnosis relating to each injury and also diagnosed Plaintiff with depression.  (Id. at 517-18.)  He opined that the December 2008 work injury was "the substantial contributing factor, as well as the prevailing or primary factor causing the disc protrusion at L4-5, as well as aggravating preexisting degenerative joint disease at L5-S1 . . . ."  (Id.)  He then assessed the percentage of permanent partial disability attributable to each injury.  (Id. at 519-20.)  He opined that "[d]isability exists as a result of her depression" and deferred to psychiatry for an assessment.  (Id. at 520.)  He opined that she "is unable to engage in any substantial gainful activity."  (Id.)  Specifically, she cannot "perform on an ongoing basis 8 hours per day, 5 days per week throughout the work year."  (Id.)  This inability includes the job she held as a housekeeper and similar jobs.  (Id.)  He advised her to limit "all bending, twisting, lifting, pushing, pulling, carrying, climbing, and other similar tasks to an as needed basis" and not to handle any weight heavier than ten to fifteen pounds.  (Id.) at 521.)  She should change positions frequently and avoid remaining in a fixed position for longer than fifteen minutes.  (Id.)

An IME was performed the same month for the same reason by Dr. Tate.  (Id. at 523-35.)  Dr. Tate reported Plaintiff having back pain prior to the December 2008 work injury.  (Id. at 523.)  Plaintiff reported that she had been referred to a surgeon for her continuing back pain – between a four and a ten – but had not been seen because she did not have insurance and was unemployed.  (Id.)  She reported that her pain was primarily in her back and right

leg and was intermittently in her left leg.  (Id.)  The pain was aggravated with bending, twisting, kneeling, walking, and lifting; it improved with pain medications, i.e., Percocet and Cymbalta.  (Id.)  On examination, Plaintiff's mood and affect were appropriate; she was alert and oriented to time, place, and person.  (Id. at 524.)  Her range of motion in her lumbar spine was self-limited to 20 percent of normal.  (Id.)  Dr. Tate noted that this was inconsistent with her ability to get on and off the examination table, "showing at least 50% of normal range of motion."  (Id.)  Straight leg raises were negative to 90 degrees in a sitting position and were positive at 30 degrees in a lying position.  (Id.)  Her complaints of pain with an attempt of passive range of motion of her lower extremities when in a sitting position were inconsistent with her straight leg raises.  (Id.)  There was no atrophy or fasciculation in her muscles.  (Id.)  Her gait was normal.  (Id.)  She had a decreased sensation in her right lower extremity in a nonanatomic distribution.  (Id.)  Dr. Tate opined that the prevailing cause of Plaintiff's low back pain was not the December 2008 injury but was preexisting degenerative disc and joint changes.  (Id. at 524-25.)  Nor did she have any permanent partial disability as a result of the later work-related injuries.  (Id. at 525.)  Dr. Tate concluded that Plaintiff was at maximum medical improvement and did not need any additional medical treatment.  (Id.)

## The ALJ's Decision

The ALJ first found that Plaintiff met the insured status requirements of the Act through December 31, 2014, and had not engaged in substantial gainful activity since her alleged disability onset date of March 27, 2010.  (Id. at 11.)  He next found that she had severe impairments of back pain, coronary disease, liver disease, and depression.  (Id.)  She

did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id.) Addressing Plaintiff's mental impairment, the ALJ concluded that she had mild restrictions in activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in concentration, persistence, or pace. (Id.) She had not had any episodes of decompensation. (Id.)

The ALJ next determined that Plaintiff had the residual functional capacity ("RFC") to perform the full range of light work. (Id. at 12.) Explaining this conclusion, the ALJ compared Plaintiff's descriptions of her exertional limitations, e.g., difficulty standing, with the objective medical record, including those relating to the treatment of her back pain, coronary disease, liver disease, and mental impairment. (Id. at 12-16.) He found that her complaints of disabling back pain were inconsistent with the objective medical records, which reflected only minimal to mild degenerative disc disease; her failure to attend all the recommended physical therapy sessions, although she had tolerated the therapy she did receive "fairly well"; her failure to seek treatment or take pain medication after June 2010; and her continuing to work for an extended period with her pre-existing back problem, as reflected in Dr. Tate's finding that the March 2010 injury "caused, at most, a temporary precipitation of symptoms." (Id. at 13-14.) The ALJ found that Plaintiff's testimony about needing to use a cane was inconsistent with her work history and the lack of any indication in the medical records that the cane was prescribed or needed. (Id. at 14.)

Addressing Plaintiff's coronary disease and liver disease, the ALJ noted that she did not testify about any limitations caused by her liver disease and had not reported any related

symptoms to medical personnel since early 2010. (Id. at 14, 15.) Nor had Plaintiff sought any treatment for a cardiac problem for more than eighteen months. (Id. at 15.) Also, a cardiac catheterization and a chest x-ray, both performed after the placement of the pacemaker, had shown no cardiac abnormalities. (Id.)

Addressing Plaintiff's mental impairment, the ALJ noted that the records from Psych Care Consultants did not include a legible signature of the clinician or that clinician's qualifications. (Id.) The source of the low GAF was unknown and the GAF itself was unsupported by the record. (Id. at 15-16.) Her depression did not result in at least four signs of a persistent depressive syndrome. (Id. at 16.) And, Plaintiff sought treatment for a mental impairment for only six months. (Id.)

The ALJ then concluded that, with her RFC, Plaintiff could perform her past relevant work as a housekeeper. (Id.) Citing her description of the hotel housekeeping job in her Work History Report, he found that that description of the job was consistent with that of the *Dictionary of Occupational Titles* ("DOT"). (Id. at 16-17.)

Plaintiff was not, therefore, disabled within the meaning of the Act. (Id. at 17.)

### Standards of Review

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 423(d)(1)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to

last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).

Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; **Hurd**, 621 F.3d at 738; **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1.  If the

claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887); <u>accord</u> **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and

set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The services of a vocational expert ("VE") or other resources, e.g., the DOT, *may* be used at this step to obtain relevant evidence of the physical and mental demands of a claimant's past relevant work, "either as the claimant actually performed it or as generally performed in the national economy." 20 C.F.R. § 1560(b)(2). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

## Discussion

Plaintiff argues that the ALJ erred by not obtaining testimony from a VE and by rejecting without explanation the opinions of Drs. Volarich and Tate. The Commissioner disagrees.

As noted above, the ALJ concluded that, with her RFC for light work, Plaintiff can perform her former housekeeping job as she actually performed it and as it is performed, according to the DOT, in the national economy. This conclusion terminated the sequential analyzation of Plaintiff's DIB application at step four.

Insofar as Plaintiff's first argument implies that a VE must be called to testify if a claimant has a nonexertional impairment, it is unavailing. "[I]t is clear in [the Eighth Circuit] that vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work. Vocational expert testimony is not required until *step five* when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments . . . ." **Banks v. Massanari**, 258 F.3d 820, 827 (8th Cir. 2001) (internal citations omitted). A VE's testimony may be relevant at step four, but it is not required. **Id.**

As noted above, at step four, "[a]n ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy." **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007). "The regulations refer to [the DOT] as a resource in determining the duties of a claimant's past relevant work." **Id.** Accord **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (holding that (1) a claimant is not disabled if she has the RFC to perform "[the actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy" and (2) "an ALJ may take notice of job information in the [DOT]").

The ALJ found that Plaintiff has the RFC to perform the full range of light work. Title 20 C.F.R. § 404.1567(b) defines "light work" as "involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." In

her Work History Report, cited by the ALJ, Plaintiff described her housekeeping job as requiring the frequent lifting of objects weighing twenty-five pounds and the occasional lifting of up to fifty pounds. Thus, the job as she actually performed it is inconsistent with the ALJ's finding that she has the RFC for nothing heavier than light work.

The ALJ also cited the DOT in support of his conclusion that, with her RFC for light work, Plaintiff can perform her past relevant work as it is performed in the national economy. The ALJ did not, however, cite a specific job definition. The DOT definition of housekeepers in the hotel industry involves "[s]upervising working activities of cleaning personnel to ensure clean, orderly attractive rooms in hotels . . . and similar establishments." <u>DOT: Housekeeper</u>, 321.137-010, 1991 WL 672778 (4th ed. rev. 1991). While this definition includes an exertional level of light work, it also includes a language level of three, requiring the ability to "[r]ead a variety of novels, magazines, . . . safety rules, instructions in the use and maintenance of . . . equipment." <u>Id.</u> The ALJ did not address the question whether Plaintiff with her Bosnian eighth grade education and inability to read English, can perform at the necessary language level.

If the ALJ meant to refer to the DOT definition of cleaner, housekeeping, in any industry, including hotels, DOT 323.687-014, he did not address the question whether Plaintiff can perform the job as it requires occasional stooping. <u>See</u> <u>DOT: Cleaner, Housekeeping</u>, 1991 WL 672783 (4th ed. rev. 1991). The RFC finding of the ALJ conformed to Dr. Tate's consistent restrictions of Plaintiff not lifting more than twenty pounds. Dr. Tate also restricted Plaintiff to no bending at the waist. The ALJ does not reject or accept this

restriction, not does he explain why. Given this omission and the omission of any reference to which DOT job classification the ALJ was relying on, the case shall be remanded for further findings on whether Plaintiff can perform her past relevant work.

Plaintiff also argues that the ALJ erred by rejecting without explanation the limitations placed on her by Drs. Volarich and Tate. Dr. Tate restricted Plaintiff to not lifting more than twenty pounds and to no bending. The first restriction is reflected in the ALJ's RFC findings; the second is addressed above.

Dr. Volarich evaluated Plaintiff pursuant to her worker's compensation claim and concluded, after seeing her this one time, that she can not engage in substantial gainful activity. The ALJ is not required to accept his opinion. See **Wagner**, 499 F.3d at 849 (holding that the opinion of a consulting physician who exams claimant only once is generally not considered substantial evidence); accord **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004). See also **Martise v. Astrue**, 641 F.3d 909, 927 (8th Cir. 2011) (noting that ALJ is not required to rely entirely on a physician's opinion or have to choose between opinions). Nor is he required to "discuss every piece of evidence submitted." **Black v. Apfel**, 143 F.3d 383, 386 (8th Cir. 1998). And, the failure to cite Dr. Volarich's opinion "does not indicate that such evidence was not considered." **Id.** See **Montgomery v. Chater**, 69 F.3d 273, 275 (8th Cir. 1995) (holding that ALJ's failure to cite in opinion an award of disability payments to claimant by employer's insurance carrier did not mean that it was not considered).

Moreover, as noted by the Commissioner, Dr. Volarich's opinion that Plaintiff is disabled according to Missouri worker's compensation law is not binding on her. See **Cruze**

**v. Chater**, 85 F.3d 1320, 1325 (8th Cir. 1996). And, "statements that a claimant could not be gainfully employed are not medical opinions but opinion on the application of the statute, a task solely to the discretion of the [Commissioner]." **Id.**

### Conclusion

For the foregoing reasons, the ALJ failed to adequately explain his conclusion that Plaintiff can perform her past relevant work as she performed it or as it is performed in the national economy. The matter will therefore be remanded for further consideration. Although the Court is aware that the ALJ's decision as to non-disability may not change after properly considering all evidence of record and undergoing the required analysis, see **Pfitzer v. Apfel**, 169 F.3d 566, 569 (8th Cir. 1999), the determination is nevertheless one that the Commissioner must make in the first instance. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED to the Commissioner for further proceedings as discussed above.

An appropriate Order of Remand shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of August, 2014.